Filed 7/13/26  Acosta v. Guntupalli CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSHUA ACOSTA,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>NAGESWARA R. GUNTUPALLI,<br><br>Defendant and Respondent. | B337932, B337955<br><br>(Los Angeles County<br>Super. Ct. No. 20STCV48320) |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Christian Gullon, Judge.  Reversed and remanded.

Law Office of Colleen O'Hara and Colleen O'Hara for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Nayri Jilizian; Law+Brandmeyer, Kent T. Brandmeyer and Bradley C. Clark for Defendant and Respondent.

———————————————————

Employees of a psychiatric hospital restrained Joshua Acosta, a minor, when he had a physical outburst during a telephone call with his mother. After the incident, Acosta suffered subconjunctival hemorrhages in both eyes, chest and jawline bruises, and red "pinprick" marks on his skin. Acosta filed suit alleging Nageswara R. Guntupalli, M.D., a psychiatrist at the hospital who was not present for the incident, violated the Child Abuse and Neglect Reporting Act (CANRA) (Pen. Code, § 11164 et seq.) by failing to report the incident as child abuse. The trial court granted Guntupalli's motion for summary judgment, and Acosta now appeals.[1] We conclude Acosta raised a triable issue of material fact. We therefore reverse the summary judgment and subsequent award of costs. We remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Underlying Incident*

On August 7, 2018, 17-year-old Acosta was admitted to Aurora Charter Oak Hospital (Aurora), a psychiatric hospital in Covina.[2] Around 8:00 p.m., Rizwana B. Hussain, M.D., conducted a physical examination of Acosta. Hussain did not record any issues with Acosta's eyes or skin and noted "no exudate or hemorrhages."

A nursing progress note by B. Mushili, R.N., written at 11:42 p.m. that night, states that Acosta asked to call his mother. While on the telephone, he began "cursing at mother and banging

_____

[1]    All undesignated statutory references are to the Penal Code.

[2]    All dates are in 2018 unless otherwise stated.

2

the phone against the wall. Continued to yell 'get me the fuck out of here, I am not staying here tonight, I will fight my way out if I have to or kill myself tonight.' " The note states "MD notified," and Acosta was given medication at 9:30 p.m. The note continued: "Dose was effective, was able to calm down, escorted to OR for closer monitoring and safety."

The next morning, August 8, Guntupalli completed a psychiatric evaluation of Acosta. His corresponding report stated it was based on his interview with Acosta and his review of Acosta's admission papers. The report notes that Acosta's eye contact was poor, and he was irritable and easily agitated. The report also stated that "patient is motivated and in good physical health." The report detailed what Acosta told Guntupalli about his thoughts, how he was feeling, and why he was in the hospital. It did not mention any allegation of a beating, choking, or other harm the night before.

That afternoon at 1:00 p.m., Acosta attended a social services group session. The record regarding his attendance indicates he participated by identifying healthy and unhealthy boundaries. It does not indicate that he shared that he had been harmed the night before.

Around 2:00 p.m., K. Saldua, R.N., evaluated Acosta and reported he was cooperative, socializing, and "able to make needs known with staff." Saldua stated Acosta was attending groups and participating in treatment, so no one-on-one care was needed. There was no mention of Acosta reporting any harm by staff the night before.

At 3:00 p.m., Acosta attended a "chemical dependency group" and participated by identifying his most important

3

boundaries. The related record does not mention him stating he had been harmed or mistreated the night before.

At 5:41 p.m., a case manager entered a progress note stating the case manager had contacted Acosta's mother and scheduled a family session for August 10. There was no reference to any alleged harm or abuse.

On August 9 at 11:20 a.m., Guntupalli recorded a "Psychiatric Progress Note (Dictation)" stating that he had spoken to staff and interviewed Acosta, who was "irritable," "isolative[,] and withdrawn." Acosta told Guntupalli he was trying to "participate in the groups and verbalize the concerns." He also said his mother had visited him the night before, and the visit was "okay." Guntupalli's report does not mention any harm or injuries.

At 11:40 a.m., Sadhna Dhand, M.D., checked Acosta for redness in both eyes. He reported that Acosta was complaining of "redness in both eyes" and "some blurring of vision at times for the last two days." Dhand diagnosed Acosta with subconjunctival hemorrhages in both eyes, gave him a medication to prevent infection, and advised him to see an ophthalmologist after discharge. Dhand's report does not mention that Acosta was harmed by another person or intentionally injured.

At 7:00 p.m., T. Bridges, R.N., examined Acosta's eyes and spoke with his mother. The related note states Acosta's eyes "are evident of scleral red discoloration; denies pain; blurred vision to the right eye . . . ." "Patient reports two versions of how bleeding occurred, telling this writer, 'Nothing happened. It just appeared yesterday'; told Dr Guntupalli, 'It happens all the time when I get upset'; told his mother 'somebody choked me[.]' Verified with mother that she has not seen this happen before and is

4

requesting patient be discharged to her for treatment. Writer informed [the] mother that patient was on a 5250 and we can call the medical doctor for further treatment. Dr Guntupalli notified, stating he is aware of [patient's] 'subconjunctival hemorrhage' and though he feels emergency services are not necessary said call the medical doctor. Dr Solomon notified and gave order to send Joshua to the ER for further evaluation." Acosta was transported to Queen of the Valley Hospital by ambulance.

At 11:15 p.m., Acosta was evaluated at the Queen of the Valley Hospital for "bilateral eye redness." Acosta told the "attending ED provider" that he was "being belligerent on Wednesday when he was placed on a 52-85. Patient states he was fighting and straining and that is when they noticed the redness to his eyes. Patient denies any pain. Patient was sent into the ER because he was complaining of some mild blurry vision in the right eye. Patient denies any blurry vision in his eyes now. . . . Patient denied any trauma to his eyes." After "severity," the attending provider wrote, "mild." The provider diagnosed Acosta with "bilateral subconjunctival hemorrhages," and noted they would resolve on their own. A triage questionnaire completed by a nurse at the emergency room states: "Blood shot eyes after he got very upset." After the question, "Is physical abuse/neglect suspected?" the nurse wrote, "N." Acosta was discharged back to Aurora that night.

On August 10 at 8:00 a.m., a nursing progress note by M. Sowa, R.N., stated that Acosta was "irritable, anxious and restless," and "focused on discharge." "His eyes continue to be bright red in the inner and outer portion," but he "denies pain/discomfort."

At 10:00 a.m., Guntupalli spoke with staff and interviewed Acosta.  Guntupalli's corresponding psychiatric progress note reported that Acosta's mother was concerned about his subconjunctival hemorrhage, and that Acosta was reporting both that it occurs "whenever he gets upset or tends to get anxious," and that the hemorrhage occurred because "someone was holding him too tight."  Guntupalli noted that the bleeding in Acosta's eyes was resolving.

At 12:30 p.m., Guntupalli wrote that he and others met Acosta's mother, who reported that Acosta "is now telling her that someone choked him when he was restrained, and as a result[,] mother, Veronica is requesting a discharge."  The note states: "House supervisor and attending DON, Mimi explained to mother a step by step and probability of how Joshua may have perceived the events of the take down."  "Mother was receptive to the information provided and was content requesting to continue visiting," and asked to bring Acosta's unofficial therapy dog.

That evening, Guntupalli wrote orders for several medications for Acosta, as well as "ice pack to both eyes as needed for discomfort."

At 10:08 p.m., a nurse entered a "wound documentation" report stating that there were "yellow bruises on chest wall, not present prior to admit."

On August 11, at 8:50 a.m., Guntupalli wrote that he had spoken to staff and interviewed the patient, who was motivated for treatment, and that his hemorrhages were resolving.  Acosta was not anxious, not presenting with threats of harm to himself or others, and the plan was to discharge Acosta for outpatient follow-up.

### *Lawsuit and Summary Judgment*

In December 2020, Acosta filed suit against Guntupalli and his alleged employers. Acosta filed the operative third amended complaint in January 2023. After a successful demurrer, only one cause of action remained against Guntupalli: a claim that he violated CANRA by failing to report child abuse or neglect as a mandatory reporter, under section 11166. The third amended complaint alleged that Acosta was injured by someone holding him too tight, yet Guntupalli failed to report this as child abuse.

Guntupalli moved for summary judgment. He argued that under the objective facts known to him at the time, a reasonable psychiatrist would not have suspected child abuse or neglect, and, therefore, he did not breach any mandatory duty to report under CANRA.

Among other evidence, Guntupalli supported his motion with Acosta's patient records from Aurora and Queen of the Valley Hospital, and Acosta's deposition testimony. At his deposition, Acosta explained that he was on the phone with his mother, "cursing at her, arguing with her, telling her if she didn't pick me up I'm going to leave." He then "hit the phone on the table" and "was immediately tackled and put to the floor by two to three male staff. They beat me. They—they had their knees on my back. [¶] Shortly, shortly after, I was put in a choke hold. I was being strangled. I was being beaten." Regarding the subconjunctival hemorrhages, Acosta denied telling anyone at the hospital that he had previously experienced a similar issue with his eyes before. However, he admitted that he did not tell anyone about the incident other than his mother and his attorney.

Guntupalli also submitted a declaration from Joseph I. Sison, M.D., a psychiatrist with a specialty in child and

adolescent psychiatry. Sison had reviewed Acosta's complaint, relevant sections of CANRA, records from the Los Angeles Police Department, medical records, depositions of Acosta and his mother, Veronica Gallegos, and Guntupalli's curriculum vitae. Sison concluded Guntupalli's care and treatment "complied with the standard of care." He further opined that there were "no facts in any of the medical records and deposition testimony" indicating that Guntupalli, "in his professional capacity," had "knowledge of or observed a child whom he knows, or reasonably suspects has been the victim of child abuse or neglect."

To form his opinions, Sison considered that Acosta did not tell anyone at Aurora that he had been attacked or strangled; medical doctors provided Acosta's medical care, not Guntupalli, a psychiatrist; Acosta told the emergency room staff that he was being belligerent on August 7, and he was fighting and straining "when they notice[d] the redness to his eyes"; an emergency room nurse reported that physical abuse or neglect was not suspected; and Acosta told Guntupalli that when he gets upset or anxious, he gets a subconjunctival hemorrhage, and also that someone was holding him too tight. Sison concluded these facts did not support a child abuse finding and did not require Guntupalli to report that Acosta was, or may have been, a victim of child abuse.

Sison further noted that Guntupalli and hospital supervisors met with Acosta's mother and explained to her the "step by step" or "take down," and how Acosta may have perceived it. Sison also cited the evidence that Acosta had been improving and was released; three physicians treated Acosta between August 7 through August 9 and none noted any suspicion of child abuse; medical providers in the emergency department did not note any suspicion of child abuse; and Acosta

8

admitted in his deposition that he did not tell anyone at Aurora he had been harmed or choked. Sison concluded that "no medical facts support a child abuse finding," and, as a result, "the standard of care did *not* require Dr. Guntupalli to report that plaintiff Acosta had been, or may have been, the victim of child abuse as a result of being held [too] tightly."

Acosta opposed summary judgment. He challenged Sison's declaration on numerous grounds and argued that, because of the declaration's deficiencies, Guntupalli failed to meet his burden as the moving party. Acosta also contended there were triable issues of material fact.

Acosta submitted a declaration from Gallegos stating that when she asked Aurora hospital employees about her son's injuries, one worker said she was not allowed to discuss it, another said maybe Acosta's eyes " 'popped' " because he was upset, and another said he had pink eye. Gallegos further declared that the hospital told her there was no incident report, she asked "workers to notify DCFS and the authorities," and she asked that Acosta receive medical care. She also took photos of Acosta on the evening of August 9, showing bruising, bleeding in his eyes, and "red pinprick marks on his face, neck, and upper chest." The photos were attached to her declaration. Gallegos further stated she told Guntupalli that Acosta had reported an "attack[]." She told other Aurora employees that she would inform the media that Acosta had been attacked if the hospital did not discharge him, after which Guntupalli "promptly" authorized Acosta's release.

Acosta submitted his own declaration. He declared that before the "attack," he was on the phone with his mother. When he slammed the phone down in frustration, two or more men

9

tackled him. His head hit the floor "with extreme force," and the men choked and strangled him. He sustained bruising to his face, neck, and body; pink dots; scratches; his eyes were red and bloody; he had trouble seeing; and his voice was hoarse. Since workers from Aurora accompanied him to the emergency room, he was scared to tell the emergency room medical providers about the attack. Acosta further declared that when he met with Guntupalli, he had already been attacked, so Guntupalli was able to see the bruising, red pin pricks, scratches, and bleeding in his eyes, and hear that his voice was hoarse.

Acosta additionally submitted a declaration from Avery J. Knapp, Jr., M.D., a neuroradiologist, and Amber O'Malley, a forensic nurse examiner. Neither declaration mentioned CANRA or child abuse. Neither opined that the evidence suggested child abuse or that someone in Guntupalli's professional capacity or scope of employment would have had knowledge of or reasonably have suspected child abuse.

Knapp interpreted an MRI image of Acosta's brain taken in May 2019. Knapp concluded that a "[c]hokehold caused vessels in eye to pop on 8/2018." This was based on Knapp's observation of a "few scattered predominantly subcortical white matter zone hyperintensities," or brain lesions, seen in the MRI report, which "could have been caused by trauma."

O'Malley has training and experience with strangulation of the neck. After reviewing the photographs Gallegos took on August 9, she concluded they indicated strangulation by a forearm chokehold and that the related pressure could have caused Acosta's subconjunctival hemorrhages. She wrote that the "photographs of Joshua Acosta depict no visible external bruising to the neck. However, there are visible green contusions

10

to both sides of his face along the right jawline and along/under the left jawline.  The lack of neck bruising with the bruising at and under the jawline, are consistent with his report of a chokehold by a forearm."

Finally, Acosta submitted evidence purporting to show that Sison was biased, and the court should therefore reject his declaration.[3]  Acosta additionally proffered evidence he claimed demonstrated that Guntupalli obstructed Acosta's efforts to depose Sison.  The evidence related to the scheduling of Sison's deposition and Guntupalli's counsel's objections during the deposition.

In February 2024, the trial court granted Guntupalli's motion for summary judgment.  The court described the issue before it as whether Guntupalli knew facts from which a reasonable person in a like position would have suspected Acosta had been abused.  The court concluded that the evidence Acosta proffered was insufficient to refute Guntupalli's evidence that no reasonable psychiatrist would have suspected child abuse.  The trial court overruled all of Acosta's evidentiary objections.  On March 1, the trial court issued a further ruling to address

---

[3]     Because we do not address Acosta's bias argument, we deny his related request for judicial notice of documents filed with the Secretary of State purporting to show that Sison and Guntupalli worked for hospitals that were part of the same corporate entity. (*OneTaste Inc. v. Netflix, Inc.* (2025) 116 Cal.App.5th 174, 194; *Save Lafayette Trees v. East Bay Regional Park Dist.* (2021) 66 Cal.App.5th 21, 29, fn. 2 [denying request for judicial notice of documents "not necessary to resolve this appeal"].)  We also deny Acosta's request to file a reply to Guntupalli's opposition to his request for judicial notice.

11

additional evidentiary arguments Acosta raised during the hearing in response to the trial court's tentative ruling.

Acosta filed two timely appeals, one from the original judgment and one from a post-judgment order awarding costs.[4] We granted Acosta's motion to consolidate the appeals.

## DISCUSSION

## I. Summary Judgment Standard of Review

A defendant moving for summary judgment has the initial burden to make a prima facie showing that the plaintiff cannot establish one or more elements of his or her challenged causes of action or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subds. (f)(1), (o), (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851.) If the defendant meets this initial burden, the burden shifts to the plaintiff to produce evidence showing that a genuine issue of material fact exists, based on specific facts. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.) "A triable issue of material fact exists ' " 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.]" [Citations.]' [Citation.]" (*Padron v. Osoy* (2025) 110 Cal.App.5th 677, 689.)

We review a summary judgment ruling de novo, " ' " 'considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.]' " (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.) "In evaluating whether there is a triable issue of

---

[4] The costs order was incorporated into an amended judgment. Acosta does not make any argument of error regarding the costs award.

12

material fact, we must view the evidence in the light most favorable to the opposing party by 'strictly constru[ing]' the evidence of the moving party, 'liberally constru[ing]' that of the opposing party, and resolving any doubts against summary judgment." (*McHenry v. Asylum Entertainment Delaware, LLC* (2020) 46 Cal.App.5th 469, 479.)

## II.   CANRA

CANRA requires a mandatory reporter, which includes a psychiatrist (§ 11165.7, subd. (a)(21)), to make a report to a law enforcement agency or a county welfare department when he or she knows of or suspects child abuse (§ 11165.9).  The version of section 11166, subdivision (a), in effect in August 2018 provided in relevant part: "[A] mandated reporter shall make a report to an agency specified in Section 11165.9 whenever the mandated reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect."

CANRA defines child abuse as non-accidental injury and harm: "[T]he term 'child abuse or neglect' includes physical injury or death inflicted by other than accidental means upon a child by another person, sexual abuse as defined in Section 11165.1, neglect as defined in Section 11165.2, the willful harming or injuring of a child or the endangering of the person or health of a child, as defined in Section 11165.3, and unlawful corporal punishment or injury as defined in Section 11165.4." (§ 11165.6.) The statute defines " 'the willful harming or injuring of a child or the endangering of the person or health of a child' " as "a situation in which any person willfully causes or permits any child to suffer, or inflicts thereon, unjustifiable physical pain or

13

mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of the child to be placed in a situation in which his or her person or health is endangered." (§ 11165.3.)

"CANRA employs an objective standard for evaluating the reasonableness of a mandated reporter's suspicion." (*Doe v. Lawndale Elementary School Dist.* (2021) 72 Cal.App.5th 113, 138 (*Lawndale Elementary*).) "Reasonable suspicion" means "that it is objectively reasonable for a person to entertain a suspicion, based upon facts that could cause a reasonable person in a like position, drawing, when appropriate, on the person's training and experience, to suspect child abuse or neglect. 'Reasonable suspicion' does not require certainty that child abuse or neglect has occurred nor does it require a specific medical indication of child abuse or neglect; any 'reasonable suspicion' is sufficient." (§ 11166, subd. (a)(1).) This objective standard is limited to facts "known to the person." (*Lawndale Elementary*, at p. 140.)

Failure to make a required report under CANRA is a misdemeanor. (§ 11166, subd. (c).) However, a mandated reporter may also face civil liability when a breach of the duty to report child abuse causes the minor to be injured.[5] (*Roe v. Hesperia Unified School Dist.* (2022) 85 Cal.App.5th 13, 32; *Lawndale Elementary*, *supra*, 72 Cal.App.5th at p. 138.)

## III. Acosta Raised a Triable Issue of Material Fact

Most of Acosta's briefing on appeal argues that Guntupalli failed to meet his initial burden to show that Acosta cannot

---

[5] Guntupalli did not seek summary judgment on the ground that Acosta could not show that any breach of Guntupalli's reporting obligation caused Acosta to be injured.

establish one or more elements of the CANRA cause of action. However, we need not address Acosta's numerous arguments on this point, because, even assuming Guntupalli met his initial burden, Acosta raised a triable issue of material fact.

Guntupalli offered evidence to establish a reasonable person in a like position would not suspect child abuse. It is undisputed that Acosta was subjected to a "take down" procedure after he had a verbal and physical outburst while on the telephone with his mother. It is also undisputed that he did not tell anyone at Aurora, including Guntupalli, that he had been beaten, strangled, or assaulted. The hospital records established that Acosta told Guntupalli and others that when he gets upset or anxious, he gets a subconjunctival hemorrhage, and also that someone was holding him too tight. The same records further established that several medical professionals evaluated Acosta and did not indicate any suspicion of child abuse. The Sison declaration opined that "Dr. Guntupalli was not required to report that plaintiff Acosta had been, or may have been, the victim of child abuse by being held [too] tightly, because no medical facts support a child abuse finding."

Acosta, however, relied on portions of Guntupalli's evidence which, if true, established that by August 9, Gallegos had told at least one nurse at Aurora that Acosta said someone had choked him. Further, Guntupalli's August 10 notes reflect that Gallegos told him Acosta was reporting that someone choked him while he was being restrained.[6] Acosta contends this was sufficient to

---

[6] Although Guntupalli objected to portions of Gallegos's declaration, he did not object to the portion in which Gallegos asserted she told Guntupalli that Acosta was attacked. Further, Guntupalli's evidence in support of summary judgment included

15

cause a reasonable person in Guntupalli's position to have a reasonable suspicion that Acosta was the victim of child abuse.

Neither Guntupalli's evidence nor his legal arguments conclusively refuted this contention. (*Doe v. Good Samaritan Hospital* (2018) 23 Cal.App.5th 653, 662 [defense burden is to show there is no factual basis for relief on any theory reasonably contemplated by plaintiff's pleadings]; *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1597 [cause of action cannot be established if the defendant's facts disprove the plaintiff's allegations as a matter of law].) "Choking" suggests the willful harming or injuring of a child. There was no evidence categorically indicating that Gallegos's report that Acosta said someone at Aurora choked him was insufficient to cause a reasonable person in Guntupalli's position to suspect Acosta was subjected to willful or non-accidental physical injury. Although Sison opined that there were no "medical facts" indicating child abuse, section 11166, subdivision (a)(1), provides that " '[r]easonable suspicion' does not require . . . a specific medical indication of child abuse or neglect; any 'reasonable suspicion' is sufficient."

Further, the Sison declaration twice mentions Gallegos's report, but fails to discuss why the information she provided would not indicate to a reasonable psychiatrist that Acosta was, or may have been, a victim of child abuse. Instead, the Sison declaration appears to implicitly conclude that Guntupalli could reasonably reject Gallegos's information, since it conflicted with Acosta's direct statements and the medical records. Yet there is no explanation for this implicit opinion. "[A]n opinion unsupported by reasons or explanations does not establish the

his note that Gallegos reported that Acosta was "telling her that someone choked him when he was restrained . . . ."

16

absence of a material fact issue for trial, as required for summary judgment. . . . [A]n expert opinion is worth no more than the reasons upon which it rests." (*Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 524; *Zaragoza v. Adam* (2025) 109 Cal.App.5th 113, 119 [moving defendant's burden to show the absence of triable issues not satisfied " 'by an expert declaration consisting of ultimate facts and conclusions that are unsupported by factual detail and reasoned explanation, even if it is admitted and unopposed' "].)

Guntupalli's summary judgment motion argued merely that "based on the objective facts known to [him], no reasonable psychiatrist would '. . . entertain a suspicion . . . to suspect child abuse or neglect.' " Yet, the motion, as well as Sison's opinion, failed to directly address the fact that Gallegos told Guntupalli that Acosta said he had been choked. When determining whether there is a triable issue of material fact, we must view the evidence in the light most favorable to the opposing party by strictly construing the moving party's evidence and resolving any doubts against summary judgment. In the absence of evidence about how a reasonable psychiatrist would evaluate a patient's claims of suffering physical abuse, a reasonable factfinder might conclude that a patient's claim that he was choked during a "take down," accompanied by the patient's visible injuries, would cause a reasonable person in a like position to suspect the non-accidental infliction of physical injury or the willful harming of a child.[7]

---

[7] Guntupalli offered no evidence explaining the "take down" procedure or suggesting that choking is a legitimate part of a take down.

17

We reject Guntupalli's contention that to establish a triable issue of fact, Acosta was required to provide expert testimony to refute Sison's conclusion and opine that a reasonable psychiatrist would have suspected child abuse. Guntupalli argues that the "threshold question is not just what Dr. Guntupalli saw, but whether those observations would create a reasonable suspicion of abuse requiring a CANRA report based on professional standards, which is beyond common knowledge."

In some cases, an expert opinion may be necessary to evaluate whether a person with the mandated reporter's training and experience would entertain a suspicion of child abuse or neglect based on the facts presented. For example, in *People ex rel. Eichenberger v. Stockton Pregnancy Control Medical Clinic, Inc.* (1988) 203 Cal.App.3d 225, 240, the court reasoned that whether the detection of a sexually transmitted disease in a child under 14 "creates a reasonable suspicion of reportable child abuse will depend in many instances on application of the health practitioner's training and experience, as [CANRA] expressly directs. It may well be that some sexually transmitted diseases are so commonly transmitted by those over age 14 that the presence of such a disease in a minor under age 14 would, in the absence of any other information, trigger a reasonable suspicion of child abuse."

Here, however, Guntupalli has not demonstrated that specialized professional expertise is necessary to determine whether it was objectively reasonable to suspect abuse in connection with Gallegos's direct statement that Acosta said he had been choked, after he had suffered visible injuries and had himself told Guntupalli that he had been held too tightly. Guntupalli cites no legal authority or evidence to support the

18

conclusion that, *based on professional experience and training*, an adolescent psychiatrist would necessarily and reasonably fail to suspect abuse when an adolescent patient, or the patient's parent, informs the psychiatrist that the adolescent has disclosed the non-accidental infliction of physical injury. To the extent Guntupalli contends that Sison's declaration expressed that opinion, and therefore required an expert opinion in response, we disagree due to the insufficiency of the Sison declaration as discussed above.

Guntupalli also contends that Acosta did not refute Sison's conclusion that "given the[] conflicting accounts" of what happened to Acosta "and the absence of any direct report," "the standard of care did *not* require Dr. Guntupalli to report" that plaintiff Acosta had been, or may have been, the victim of child abuse as a result of being held too tightly because no medical facts support a child abuse finding. This appears to be an argument that Guntupalli could reasonably *reject* the conflicting account suggesting Acosta had suffered abuse. Yet, at least one court has rejected the argument that under a similar mandatory reporting statute, a defendant is "permitted to apply her professional expertise to resolve any . . . suspicion [of abuse]— that is, if she determined that the allegation of abuse was unfounded, based on her experience and training, she did not entertain a reasonable suspicion and therefore had no duty to report the incident as suspected abuse." (*People v. Davis* (2005) 126 Cal.App.4th 1416, 1426 (*Davis*).)

In *Davis*, the court considered a defendant's reporting obligation under the Elder Abuse and Dependent Adult Civil Protection Act, which contains mandatory reporting requirements analogous to CANRA. (*Davis, supra*, 126

19

Cal.App.4th at p. 1427, fn. 7.)  The defendant, a licensed administrator at a private skilled nursing facility providing psychiatric care, argued she was not required to report abuse after learning that an employee had a physical altercation with a 19-year-old dependent adult and resident at the facility.  The employee choked the victim.  (*Id*. at pp. 1423–1424.)  The defendant took the position that because the statute defined " 'reasonable suspicion' as 'an objectively reasonable suspicion that a person would entertain, based upon facts that could cause a reasonable person in a like position, drawing when appropriate upon his or her training and experience, to suspect abuse,' she was not required to report the incident as possible abuse because a person with her training and expertise as a licensed nursing home administrator and with her knowledge of the individuals involved in the incident would have reasonably concluded that [the employee's] conduct did not constitute physical abuse."  (*Id*. at p. 1431.)

The court rejected the argument, relying in part on analogies to CANRA.  The court concluded the relevant statutes "provide for an objective standard, and . . . they do not permit the application of a mandated reporter's expertise to allow the reporter to determine whether abuse occurred.  Rather, if the circumstances give rise to an objective basis for *suspecting* that abuse occurred, reporting is mandatory."  (*Davis*, *supra*, 126 Cal.App.4th at p. 1426.)  Similarly, here, Guntupalli could not defeat Acosta's claim at the summary judgment stage with Sison's conclusory opinion that Guntupalli was not required to report abuse because he could rely on his unspecified training and expertise to reject Acosta's indirect claim of abuse as unfounded.

20

In sum, there was evidence that Guntupalli knew Acosta said he had been choked while at Aurora. This created a triable issue of material fact as to whether an objectively reasonable person in Guntupalli's like position in possession of this information would suspect child abuse. Guntupalli failed to sufficiently address this evidence, either by expert opinion or otherwise. He therefore was not entitled to summary judgment. Because we accordingly reverse the judgment, we must also reverse the order awarding Guntupalli costs.

**DISPOSITION**

The judgment and order are reversed and the matter is remanded for further proceedings. Appellant is awarded his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EGERTON, Acting P. J.

HANASONO, J.